IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

SHERILYN LARAINE BARILANI, A.C.B, Z.C.B,
A.L.B., G.M.A.B, and WISCONSIN DEPARTMENT
OF HEATLH SERVICES,

                      Plaintiffs,

    v.                                                OPINION and ORDER

HOUSING AUTHORITY OF THE CITY OF              21-cv-113-jdp
EAU CLAIRE, KEITH JONATHAN,
AMERICAN FAMILY MUTUTAL INSURANCE
COMPANY, S.I., and ABC INSURANCE COMPANY;

                      Defendants.

---

      Plaintiffs, Sherilyn LaRaine Barilani and her four minor children, moved into a public housing unit that was owned and managed by defendant, the Housing Authority of the City of Eau Claire. The house had recurring water leaks, and after several years, Barilani became concerned about toxic mold. In 2019, she became seriously ill and spent several days in the hospital. She attributes her illness to toxic mold, which was eventually confirmed in her home. Barilani alleges that the housing authority and its executive director, Keith Jonathan, violated her rights under the Federal Housing Act and her rights to substantive due process under the Constitution. Barilani also asserts state-law claims.

      The housing authority and Jonathan move to dismiss Barilani's claims on several grounds. Dkt. 17. The court concludes that Barilani fails to state a claim under the Federal Housing Act because that law confers no enforceable federal right to housing of a certain quality. As for her substantive due process claim, Barilani alleges tortious conduct, but not conduct that would violate the Constitution. With the federal claims dismissed, the court will

decline to exercise supplemental jurisdiction over Barilani's state-law claims and close the case. The court need not consider the other potential grounds for dismissal.

ALLEGATIONS OF FACT

The court draws the following facts from Barilani's amended complaint, Dkt. 27, and accepts them as true for purpose of the motion to dismiss.

In January 2015, Sherilyn LaRaine Barilani and her four children moved into a house in Eau Claire through a federal housing program. (For simplicity the court will refer to the plaintiffs as Barilani.) Defendants, the Housing Authority of the City of Eau Claire and its executive director, Keith Jonathan owned and managed the property. (Again, for simplicity, the court will refer to the defendants as the housing authority). Barilani noticed leaks in the kitchen and two bathrooms shortly after she moved in. She placed a maintenance request and the housing authority fixed the leaks within two weeks. But the leaks came back every six months. Each time Barilani complained, the leaks were fixed within one to two weeks.

The housing authority also inspected Barilani's house every six months. Several inspection reports noted that Barilani's kitchen floor had tile damage. In 2018, Barilani asked the housing authority if it was possible that the recurring leak in her kitchen was causing the tile damage. Maintenance officials responded that it wasn't possible to determine the source of the tile damage without replacing the floor, which they could not do until Barilani moved out.

In summer 2018, Barilani planned to take a ten-day trip and asked the housing authority to investigate the tile damage while she was gone. She expressed concern that "there was mold under the tile, and that it could make her and her children sick." Dkt. 27 at ¶ 17. She also said that she thought water was soaking into the subfloor. Officials told her that ten

days wasn't enough time to fix the floor or inspect for mold; they could only do it when she moved out. They told her that she was being "paranoid" and assured her not worry about the leaks.

In October 2019, Barilani told the housing authority that "the floor was rotting underneath the kitchen tiles, and that the subfloor appeared to be rotting as well." *Id.* at ¶ 23. The housing authority responded that she was being "overly dramatic" and did not send maintenance workers to her home for several weeks. In the meantime, Barilani got sick. She had been fatigued for several months, and on the morning of December 27, 2019, she woke up with difficulty breathing and coughed up blood. An ambulance took her to a hospital in Eau Claire. She was airlifted by helicopter to a hospital in Rochester, Minnesota and was admitted for 12 days, five of which she spent on life support.

She was discharged and returned home on January 7, 2020. Her health "quickly declined again." *Id.* at ¶ 31. She decided to move out of the house but continued to pay rent through the end of the year. Barilani's illness was caused by her exposure to the toxic mold growing in her kitchen.

After she returned from the hospital, Barilani contacted the Eau Claire City-County Health Department. The health department inspected her house and ordered the housing authority to remediate mold in the floor and subfloor, although it is not clear whether the health department suspected the mold or actually confirmed it. But the housing authority didn't comply with the order. Instead, it installed a layer of new subfloor over the moldy subfloor. The health department inspected the floor again and suggested that Barilani test for mold. Testing revealed "elevated levels of multiple molds and their toxic byproducts." *Id.* at ¶ 35.

Barilani's children also suffered from adverse health conditions caused by their exposure to toxic mold, including anxiety, depression, anger, inability to focus, sleep problems, headaches, rashes, difficulty breathing, and hair loss.

ANALYSIS

Barilani's federal claims are brought under 42 U.S.C. § 1983, which provides a remedy for the violation of federal rights by persons acting under color of state law. *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 119, (2005) (citing *Maine v. Thiboutot*, 448 U.S. 1, 4 (1980)). Barilani alleges that the housing authority's failure to remediate the toxic mold in her house violated both her statutory rights under the Federal Housing Act and her constitutional right to substantive due process.

The housing authority moves to dismiss Barilani's claims under Federal Rule of Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the complaint. *Szabo v. Bridgeport Mach., Inc.*, 249 F.3d 672, 675 (7th Cir. 2001). The court must accept the complaint's well-pleaded allegations as true and draw all reasonable inferences from those facts in the plaintiff's favor, but the court is not bound to accept legal conclusions. *Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 826 (7th Cir. 2015). When the allegations in a complaint cannot raise a claim of entitlement to relief, dismissal is appropriate. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 558 (2007).

Barilani's federal claims must be dismissed. The Federal Housing Act does not confer an enforceable right to housing that meets quality standards, so Barilani cannot bring a claim under that statute. And although Barilani alleges tortious conduct on the part of the housing

authority, ordinary tortious conduct does not violate the Constitution. To state a claim for a violation of her substantive due process rights, Barilani must allege that the housing authority violated her rights in a manner that shocks the conscience. Barilani's allegations cannot meet the demanding substantive due process standard.

### A. Federal Housing Act claim

For the source of her federal statutory rights, Barilani points to a provision of the Federal Housing Act that deals with contracts between the U.S. Department of Housing and Urban Development (HUD) and local public housing agencies.[1] That contracting provision, 42 U.S.C. § 1437d(f), requires that HUD contracts obligate public housing agencies to maintain housing units in accordance with housing quality standards. Section 1437d(f) directs the HUD secretary to set those standards:

> The Secretary shall establish housing quality standards under this paragraph that ensure that public housing dwelling units are safe and habitable. Such standards shall include requirements relating to habitability, including maintenance, health and sanitation factors, condition, and construction of dwellings . . .

42 U.S.C. § 1437d(f)(2). A federal regulation, 24 C.F.R. § 5.703(f), implements that directive:

> All areas and components of the housing must be free of health and safety hazards. These areas include, but are not limited to, air quality, electrical hazards, elevators, emergency/fire exits, flammable materials, garbage and debris, handrail hazards, infestation, and lead-based paint . . . The dwelling units and common areas must have proper ventilation and be free of mold, odor (e.g., propane, natural gas, methane gas), or other observable deficiencies.

---

[1] Barilani's complaint asserted rights under additional provisions of the Fair Housing Act, specifically 42 U.S.C. § 1437(a)(1)(a) and § 1437d(l). In response to the housing authority's motion to dismiss, Barilani has abandoned claims under those sections.

5

24 C.F.R. § 5.703(f). Another regulation, 24 C.F.R. § 5.703(g), requires public housing conditions to comply with state and local building and maintenance codes. Barilani alleges that the housing authority violated these federal standards by failing to remediate the mold in her house.

But it is not enough for Barilani to allege a violation of federal housing standards. To state a claim under § 1983, a plaintiff must assert that government has violated a federal right, not merely a federal law. *Blessing v. Freestone*, 520 U.S. 329, 340 (1997). The question then is whether the Fair Housing Act gives the occupants of federally funded housing the right to sue for substandard housing conditions. To determine whether a statute creates an enforceable federal right, *Blessing* established the following test: (1) Congress must have intended the provision to benefit the plaintiff; (2) the asserted right must not be so vague and amorphous that it strains judicial enforcement; and (3) the statute must be phrased in mandatory rather than precatory terms. *Blessing*, 520 U.S. at 340–41 (quotations omitted). In this case, the first requirement is decisive.

Nothing short of an unambiguously conferred right will support a cause of action under § 1983. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002). It is not enough that a plaintiff falls within a statute's "general zone of interest" or has statutory "benefits or interests." *Id.* at 283. Congress must speak with a clear and unambiguous voice to create an enforceable federal right. *Id.* Specifically, a statute "must be phrased in terms of the persons benefited" to create a right. *Id.* at 274. For example, the rights-creating Title VI of the Civil Rights Act states, "No person in the United States shall . . . be subjected to discrimination." *Id*. In contrast, the statute at issue in *Gonzaga*, a provision of the Family Educational Rights and Privacy Act, directed the secretary of the Department of Education to withhold federal funding to educational

6

institutions that failed to comply with the law's record-disclosure requirements. *Id.* at 276. The court concluded that the statute had no rights-creating language because it addressed the secretary rather than individual students. *Id.* at 287. The provision also had an "aggregate" policy focus and served to direct the secretary's actions. *Id.* at 290. *Gonzaga* concluded that there was "no question that [the] provision failed to confer enforceable rights" enforceable under § 1983. *Id.* at 287.

The statute that Barilani relies on is, in all material ways, like the provisions at issue in *Gonzaga*. To be sure, Congress passed the Federal Housing Act to assist states in providing safe and decent housing for low-income families. So public housing residents like Barilani stand to gain from the statute and the standards imposed under its authority. But falling within a statute's general zone of interest does not give rise to enforceable rights under § 1983. *Id.* at 274.

Neither § 1437d(f) nor its implementing regulations contain the unambiguous, rights-creating language that is needed to show clear congressional intent to create a federal right. Section 1437d(f) doesn't refer to low-income families or public housing tenants. Rather, the statute is phrased in terms of HUD's contracting requirements. It requires HUD to include certain terms in its contracts with public housing agencies, and it directs the HUD secretary to develop housing standards to be included as contract terms. Those regulations implementing the standards are not phrased in terms of tenants or families either. The regulations focus on housing units and the various health and safety conditions that the units must meet. 24 C.F.R. § 5.703(f) and (g). The statute reflects congressional intent to ensure that federal funds go to public housing agencies that maintain units in compliance with housing quality standards. But it does not reflect congressional intent to create an enforceable right to housing of a particular

7

condition, as other courts have concluded. *See Hill v. San Francisco Hous. Auth.*, 207 F. Supp. 2d 1021, 1028 (N.D. Cal. 2002); *Johnson v. City of Detroit*, 446 F.3d 614, 627 (6th Cir. 2006) (§ 1437d(f) focuses on HUD's responsibilities and gives HUD the authority to issue housing quality standards, but it does not contain language that unambiguously creates tenants' rights); *McField ex rel. Ray v. Philadelphia Hous. Auth.*, 992 F. Supp. 2d 481, 488 (E.D. Pa. 2014) ("§ 1437d(f) focuses on the person regulated rather than the individuals protected, and so it does not create a private right enforceable through § 1983.").

Barilani relies on *Stevenson v. Willis*, 579 F. Supp. 2d 913 (N.D. Ohio 2008) for the proposition that courts have concluded the Federal Housing Act creates enforceable federal rights. But *Stevenson* involved § 1437d(k), not § 1437d(f). Section 1437d(k) establishes procedural rights for tenants facing termination of housing benefits. Specifically, § 1437d(k) requires the HUD secretary to require public housing agencies to "implement an administrative grievance procedure under which tenants will" be afforded certain procedural safeguards, such as the opportunity for a hearing. *Id*. at 922. The *Stephenson* court concluded that Congress intended the provision to benefit tenants because it required the HUD secretary to implement regulations that would provide specific rights to tenants. *Id*. Other courts have reached the same conclusion about § 1437d(k). *See Manzo v. Anaheim Hous. Auth.*, No. 820-cv-02110-jls-dfm, 2021 WL 4805456, at *4 (C.D. Cal. June 3, 2021) ("Section 1437d(k) manifests an unmistakable congressional intent to confer Section 8 tenants with a right to an administrative grievance process"); *Gammons v. Massachusetts Dep't of Hous. & Cmty. Dev.*, 523 F. Supp. 2d 76, 84 (D. Mass. 2007) (same).

*Stevenson* does not help Barilani. Rather, it shows that § 1437d(k) has the explicit rights-creating language that § 1437d(f) lacks. Section § 1437d(f) does not confer an enforceable

8

right to housing that complies with federal habitability standards, and Barilani does not have federal statutory right on which to base a claim under § 1983.

## B. Substantive due process claims

Barilani also contends that the housing authority violated her federal constitutional right to substantive due process. The Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Supreme Court has held that some rights and liberty interests are so fundamental that no amount of process would justify government interference, and the Court refers to this concept as substantive due process. *County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998).

Barilani contends that the housing authority violated her fundamental right to bodily integrity, which is a recognized liberty interest that may provide the basis for a substantive due process claim. *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). But the Fourteenth Amendment is a restriction on governmental interference with one's rights. And the housing authority did not directly interfere with Barilani's right to bodily integrity. Barilani does not allege, for example, that the housing authority knowingly sprayed her home with toxic mold.

For her substantive due process claim Barilani invokes the state-created danger doctrine, which applies when the state places a person in a dangerous situation and fails to protect the person from that danger. *Johnson v. Rimmer*, 936 F.3d 695, 706 (7th Cir. 2019) (citing *DeShaney v. Winnebago County Social Services Department*, 489 U.S. 189 (1989)). The elements of a claim under the state-created danger doctrine are that: (1) the defendant, by its affirmative acts, created or increased a danger that the plaintiff faced; (2) the defendant's failure to protect the plaintiff from danger was the proximate cause of plaintiff's injury; and (3) the defendant's

conduct was so arbitrary and irrational that it shocks the conscience. *Jackson v. Indian Prairie Sch. Dist.* 204, 653 F.3d 647, 654 (7th Cir. 2011). The housing authority contends that Barilani's allegations fail to satisfy *any* of the elements. But the court will focus on the third element, which requires Barilani to show that the housing authority's conduct was so arbitrary and irrational that it shocks the conscience.

The shocks-the-conscience standard is a high bar, excluding all but the most egregious and outrageous government conduct. *Nelson*, 992 F.3d at 604. The Due Process Clause does not guarantee minimal levels of safety. *DeShaney*, 498 U.S. at 195. And it is well-settled that general misconduct, negligence, or even gross negligence, are not enough to violate the Constitution. *Nelson*, 992 F.3d at 604. As the Supreme Court put it in *DeShaney*, the Due Process Clause "does not transform every tort committed by a state actor into a constitutional violation." 498 U.S. at 202. When, as in this case, the government conduct unfolds over time, allowing for officials to make reasoned deliberations, conduct is conscious-shocking if it reflects deliberate indifference to the plaintiff's rights. *King ex rel. King v. E. St. Louis Sch. Dist. 189*, 496 F.3d 812, 819 (7th Cir. 2007). In the substantive due process context, deliberate indifference requires actual knowledge of the dangerous condition, or at least that the dangerous condition was obvious. *Slade v. Bd. of Sch. Directors of City of Milwaukee*, 702 F.3d 1027, 1030 (7th Cir. 2012) (the precise state of knowledge required remains unsettled). But in practice, the difference between a known risk and an obvious one is usually unimportant. *Id.*

*Jackson* illustrates how difficult it would be to establish a substantive due process deprivation based merely on a risk of harm. *Jackson* involved an elementary-school student with a history of violent outbursts. After one such outburst, the principal thought that the student had calmed down and sent Jackson, his assigned special-education teacher, to discuss the

10

incident with him. 653 F.3d at 649. The student became agitated again and swung a chair at Jackson, who fell and was injured in trying to protect herself. *Id.* The student clearly posed a risk of injury: he had a long history of violent behavior, including hitting, kicking, scratching, and throwing objects, which had harmed Jackson and others in the past. *Id.* at 655. Jackson, other teachers, and the parents of other students had asked that the student be removed from the school, and Jackson had specifically asked the principal to have the student reassigned away from her. *Id.* at 651. So the principal and the school district were well aware of the safety risk posed by the student's outbursts. Even so, the court concluded that the actions of the principal and district officials did not meet the shock-the-conscience standard. *Id.* at 656. The court deemed the case a close one and concluded that defendants' actions were "short-sighted, flawed, negligent, and tortious." *Id.* But the defendant's actions were not so egregious that they violated the Constitution. *Id.*

Barilani alleges conduct no more egregious than that in *Jackson*. During the first three-and-half years that she lived in her house, she raised no concerns about mold. She reported water leaks in her kitchen and bathroom every six months, which, each time, the housing authority fixed within two weeks. Despite performing semiannual inspections that noted water damage to her kitchen floor, the housing authority didn't identify mold. Barilani first told the housing authority that she was worried about mold in 2018. But she didn't report visible signs of mold or that she was feeling sick at that time, only that she believed that water was soaking into her kitchen subfloor. Recurrent water leaks and water damage alone do not demonstrate the presence of mold, although those conditions might lead to the growth of mold.

Barilani alleges that the housing authority made obviously wrongful decisions starting in October 2019. When Barilani told the housing authority that her floor was rotting, officials

11

failed to inspect her unit, and told her not to worry. And in January 2020, after Barilani was hospitalized, the Eau Claire health department ordered mold remediation, yet the housing authority simply covered the moldy subfloor with new subfloor. But by that point, Barilani had already decided to move out. And she points to no injury that she suffered because of the way that the housing authority repaired her floor. It would have been different if the housing authority actually knew that there was toxic mold in Barilani's house, refused to remediate it, and caused her illness. But that isn't what Barilani alleges. The housing authority made flawed, negligent, and short-sighted decisions, but it did not ignore a known or obvious condition that threatened Barilani's health. Barilani hasn't alleged conduct by the housing authority that is any more dangerous or conscience-shocking than the conduct of the school district defendants in *Jackson*.

Barilani cites *Guertin v. State*, 912 F.3d 907, 921 (6th Cir. 2019), which she says shows that false assurances of safety can meet the shocks-the-conscience standard. *Guertin* involved the Flint, Michigan, water crisis. Officials of the city of Flint and the state of Michigan switched Flint's water supply from the Detroit system to the Flint River without properly treating the water, which caused a lead contamination crisis. *Id.* at 915. The court concluded that the officials' actions were conscience-shocking because the officials authorized Flint to distribute water that they knew was highly unsafe, ignored an unfolding public health crisis, ignored warnings from experts, and falsely assured the public that the water was safe and attempted to refute assertions that it was contaminated. *Id.* at 927–29.

The housing authority's actions simply are not comparable to the defendants' actions in *Guertin*. In *Guertin*, the defendants knowingly switched to an unsafe water supply and then lied about it. The defendant officials both caused the crisis and impaired the community's

ability to protect itself. Here, the alleged conduct of the housing authority was stubbornly neglectful, but the housing authority did not knowingly expose Barilani to the dangerous substance. When the housing authority cavalierly told Barilani not to worry about mold, mold had not yet been identified in her house, and she had not yet gotten sick. Toxic mold was confirmed by testing only after Barilani moved out. The *Guertin* defendants pumped poison into Flint homes and then tried to conceal it. But the housing authority didn't lie to Barilani about a danger that it knew about.

Barilani also contends that the housing authority violated her right to substantive due process by depriving her of a property interest in her housing benefits. In limited situations, a property interest may provide the basis for a substantive due process claim. *Polenz v. Parrott*, 883 F.2d 551, 557–58 (7th Cir. 1989). But to state a substantive due process claim based only on the deprivation of a property interest, a plaintiff must first allege that available state-law remedies are inadequate or that government violated some other constitutional right. *Lee v. City of Chicago*, 330 F.3d 456, 467 (7th Cir. 2003). The court then determines whether the government conduct reaches the shock-the-conscience level. *Nelson v. City of Chicago*, 992 F.3d 599, 604 (7th Cir. 2021).

Barilani has not established an independent constitutional violation, and the court need not decide whether state-law remedies for the alleged deprivation are adequate. Similar to the court's conclusion above, Barilani does not allege conduct by the housing authority that shocks the conscience. To deprive a person of a property interest in a manner that shocks the conscience, a government official must abuse his state power to dispossess a person of his property. *See, e.g., Belcher v. Norton*, 497 F.3d 742, 753 (7th Cir. 2007) (officer's threats to arrest plaintiff if plaintiff did not sign over the title of his vehicle to a towing company shocked

13

the conscience). The housing authority's mishandling of Barilani's maintenance issues prompted her to leave the house. But the housing authority did not arbitrarily eliminate her housing or use threats to take away her home.

Barilani's allegations do not rise to the required conscience-shocking level. Accordingly, the court must dismiss her substantive due process claims.

**C. State-law claims**

Barilani also brings claims for breach-of-contract and violations of Wisconsin's landlord-tenant statute and consumer protection code. Wis. Stat. § 704.07; Wis. Admin. Code § 134.04. If the court had viable federal claims, the court would exercise supplemental jurisdiction over those claims under 28 U.S.C. §1367(a), which permits a federal district court to hear state-law claims that are related to federal claims in the same action. But absent unusual circumstances, district courts will relinquish supplemental jurisdiction over state-law claims if all federal claims have been resolved before trial. *Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 352 (7th Cir. 2019). Here, neither party identifies any unusual circumstances that would justify retaining jurisdiction over Barilani's state-late claims, so the court will decline supplemental jurisdiction over them.

CONCLUSION

Barilani's allegations do not show that the housing authority violated her federal statutory or constitutional rights. The court will decline to exercise supplemental jurisdiction over Barilani's state-law claims, grant the housing authority's motion to dismiss, and close the case.

ORDER

IT IS ORDERED that

1. Defendants' motion to dismiss, Dkt. 17, is GRANTED. The case is dismissed under Federal Rule of Civil Procedure 12(b)(6).

2. The clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered February 9, 2022.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge